STATE of Maine

v.

Sonny E. ELLINGWOOD.

Supreme Judicial Court of Maine.

Dec. 26, 1979.

Charles K. Leadbetter (orally), Fernand R. Larochelle, Asst. Attys. Gen., Augusta, for plaintiff.

Vafiades, Brountas & Kominsky, Susan R. Kominsky (orally), Lewis V. Vafiades, Bangor, for defendant.

Before POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

NICHOLS, Justice.

The Defendant, Sonny E. Ellingwood, appeals from his judgment of conviction of criminal homicide (17–A M.R.S.A. § 202),[1] dated November 6, 1978, following a jury-waived trial in Superior Court in Penobscot County on July 10, 1978.

On this appeal he asserts (1) that it was violative of his constitutional rights to place upon him the burden of proof of lack of criminal responsibility pursuant to 17–A M.R.S.A. § 58(3);[2] (2) that the evidence

---

1. P.L.1975, c. 740, § 40 in effect at the time of the alleged offense on September 17, 1977, read in pertinent part:

 1. A person is guilty of a criminal homicide in the 2d degree if:

 A. He causes the death of another intending to cause such death, or knowing that death

will almost certainly result from his conduct;

 . . .

2. 17–A M.R.S.A. § 58 provides:

 1. An accused is not criminally responsible if, at the time of the criminal conduct, as a result of mental disease or defect, he either lacked substantial capacity to conform his

required a finding of lack of criminal responsibility as defined in 17–A M.R.S.A. § 58(1) and (2) as a matter of law; and (3) the evidence was insufficient to show the existence of the alternative culpable states of mind required for conviction.

We deny the appeal.

On September 17, 1977, at a gravel pit in Alton, Maine, the Defendant shot and killed James Hunter and shot and injured Jacqueline Hunter.[3] He committed these shootings with only the slightest provocation and with little or no discernible motive. His mental condition at the time of this shooting became the central issue at trial.

## I

■ The Defendant contends that it violates fundamental fairness and the mandate of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), to require that he prove his lack of criminal responsibility as a result of mental disease or defect.

This Court has repeatedly held that this allocation of the burden of proof on this issue is permissible under the Maine and United States constitutions. *State v. Buzynski*, Me., 330 A.2d 422 (1974); *State v. Melvin*, Me., 341 A.2d 376 (1975); *State v. Armstrong*, Me., 344 A.2d 42 (1975); *State v. Tracy*, Me., 372 A.2d 1048 (1977); *see also State v. Rice*, Me., 379 A.2d 140, 146 (1977).

In *Patterson v. New York*, 432 U.S. 197, 207, 97 S.Ct. 2319, 2325, 53 L.Ed.2d 281, 290 (1977) the United States Supreme Court declared its unwillingness to reconsider its prior decisions upholding the constitutionality of procedures which place upon the defendant the burden of proving his lack of sanity.

We are aware of no factors that today make fundamentally unfair, and therefore unconstitutional, a practice which has been repeatedly approved by our Court and so recently permitted by the United States Supreme Court.

The Defendant takes nothing by this point on his appeal.

## II

The Defendant urges that the evidence showed as a matter of law that he was not criminally responsible because at the time of the criminal conduct he lacked a substantial capacity to conform his conduct to the requirements of the law as a result of mental disease or defect. He focuses attention upon the uncontradicted testimony of a psychiatrist, Lawrence C. Salveson, M.D., whom he called as a witness in his defense.

■ A judgment of acquittal by reason of insanity is appropriate only when a jury verdict of guilty would clearly violate the law or the facts. *State v. Armstrong*, Me., 344 A.2d 42, 52 (1975); *Washington v. United States*, 129 U.S.App.D.C. 29, 31, 390 F.2d 444, 446 (D.C.Cir.1967). Whether or not in a given case the defendant lacks criminal responsibility for his criminal conduct is a question of fact which the jury must determine from all the evidence in that case. *State v. Scott*, Me., 343 A.2d 177, 179 (1975); *State v. Durgin*, Me., 311 A.2d 266, 268 (1973). In making that finding the credibil-

conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct.

1–A. In a prosecution for a crime which may be committed intentionally, knowingly or recklessly, where such culpable state of mind is a necessary element, the existence of a reasonable doubt as to such state of mind may be established by evidence of an abnormal condition of mind.

2. As used in this section, "mental disease or defect" means any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs the processes and capacity of a person to control his actions. An abnormality manifested only by repeated criminal conduct or

excessive use of alcohol, drugs or similar substances, in and of itself does not constitute a "mental disease or defect."

3. The defendant shall have the burden of proving, by a preponderance of the evidence, that he lacks criminal responsibility as described in subsection 1.

3. On October 4, 1977, the Defendant was indicted for one count of second degree criminal homicide and one count of criminal attempt, specifically, attempted second degree criminal homicide. He was acquitted on the second count following trial on the basis of the absence of the specific intent necessary to commit criminal attempt.

ity and weight to be given to the testimony of the witnesses is a matter for the fact-finder. *State v. Flaherty*, Me., 394 A.2d 1176, 1177 (1978); *McDonald v. United States*, 114 U.S.App.D.C. 120, 123, 312 F.2d 847, 850 (D.C.Cir.1962); H. Glassman, *Maine Practice* § 23.5 (1967). The decision of a justice sitting as the fact-finder without a jury is to be accorded the same deference in this respect as that of a jury. *State v. Gove*, Me., 379 A.2d 152, 153 (1977). A cold record is an unacceptable substitute for live testimony. *Id.* at 154.

The fact-finder is not bound by the conclusions of psychiatrists who testify concerning their opinions of the mental condition of a defendant. Where the facts and assumptions underlying expert opinions are amply exposed during their testimony in the course of trial, the fact-finder is entitled to draw his own ultimate conclusions. *King v. United States*, 125 U.S.App.D.C. 318, 323, 372 F.2d 383, 388 (D.C.Cir.1966); *McDonald v. United States*, 114 U.S.App. D.C. at 124, *supra*, 312 F.2d at 851.

A judgment of acquittal will not be granted on this ground where the record contains testimony, other than that of experts, from which the fact-finder could reasonably conclude that the defendant did not lack substantial capacity to conform his conduct to the requirements of the law or to appreciate the wrongfulness of his conduct. *See Commonwealth v. Zlatovich*, 440 Pa. 388, 392–393, 269 A.2d 469, 471 (1970); *Commonwealth v. Francis*, 355 Mass. 108, 111, 243 N.E.2d 169, 172 (1969); *King v. United States, supra; McDonald v. United States, supra.*

In the case before us a reasonable fact-finder might not have been convinced by a preponderance of the evidence that this Defendant was suffering from a mental disease or defect which resulted in a substantial lack of capacity to conform his conduct to the requirements of the law or to appreciate the wrongfulness of his conduct.

The testimony adduced at trial from the one expert witness and from the Defendant's relatives and acquaintances, revealed the following facts: On the day of the shooting the Defendant was upset about various minor problems arising at home and on the job. During the morning he had corrected an erroneous estimate he had made on a construction project. Apparently his work as a finish carpenter had deteriorated somewhat in the weeks preceding the shooting.

At about noon of this day he returned home with two six-packs of beer. He drank one at that time. His wife chided him for drinking during the day. He complained about being pushed around by people and declared he wanted to quit his job and leave the state.

Later he left his house trailer, taking with him his rifle and two bottles of beer. One of these bottles he put down and shot with his rifle. His wife came out of the trailer and reprimanded him for this action. He walked away toward the nearby gravel pit.

At the pit the Defendant found James Hunter and his daughter, Jacqueline, removing some loam from the pit. The owner of the pit had requested that the Defendant keep watch over the pit. The Defendant confronted this pair demanding to know by what right they were removing soil from the pit. James Hunter countered by asking what business it was to the Defendant. After this brief interchange the Defendant turned his back to them, put down the remaining beer bottle, and turned again, aiming the rifle at James Hunter.

He sighted the rifle on James Hunter for a few seconds. The victim pointed at the Defendant and ordered him to put down the gun. The Defendant then shot, hitting James Hunter in the chest. Jacqueline Hunter heard the Defendant prepare his rifle for a second shot. She looked at him and ordered him to put down the gun. He shot her in the face.

Just after the shooting Edward Laliberte drove into the pit to ask the Defendant whether he had seen two boys that day. The Defendant, upset, responded somewhat angrily that the boys were on Laliberte's own porch, a statement which was obviously untrue.

The Defendant's wife drove into the pit and picked up the Defendant, who then told her his life was over, that he should shoot himself because he had just killed two people. They then drove to Dewey Ellingwood's house at the Defendant's request, where the police were called, again at the Defendant's request.

Police officers described the Defendant as blubbering, babbling and crying. He seems to have been intermittently coherent, because he admitted the shooting in general terms at that time. He was never able to recall the events in detail.

 The only expert testimony was presented by the Defendant. The psychiatrist, Lawrence C. Salveson, M.D., concluded that the Defendant had been subject to a massive "dissociative reaction" stemming from his past stress and an underlying obsessive-compulsive and hysterical personality disorder. He stated that the Defendant at some primitive level of mentality knew he was shooting, that he believed he was acting partially in self-defense. It was his conclusion on the ultimate facts that the Defendant was suffering from a mental disease or defect at the time of the shooting, that he had no rational adult control over his behavior, that he did not have substantial capacity to appreciate the wrongfulness of his conduct, and that this condition was related to the shooting.[4]

In evaluating this, as other testimony, the presiding justice was entitled to give the evidence the weight he felt it was due.

 Although the presiding justice expressed his view that the credibility of the witnesses was not an issue, he obviously was not convinced by the psychiatrist's testimony. A belief in a witness' sincerity does not necessitate a belief in his veracity.

 The presiding justice concluded that he had no reasonable doubt that the Defendant had the capacity to appreciate the wrongfulness of his conduct. In reaching this conclusion he found strong support in the immediate reaction of the Defendant to his own conduct, which was hopelessness based upon knowledge of the awful wrong he had done.

The presiding justice also concluded that the Defendant had not shown that it was more likely than not that he lacked substantial capacity to conform his conduct to the requirements of the law. Again the evidence demonstrated that moments after the shooting the Defendant possessed considerable control over his conduct.

He reloaded his rifle, conversed with Edward Laliberte, admitted the crime to his wife, acknowledging his understanding of the nature of his acts, and instructed her to drive to his brother's house and to call the police. The testimony of Jacqueline Hunter, the only eye-witness to the shooting to testify, supplied a significant basis upon

---

4. Whenever an issue of "mental disease or defect" is reached, the role of the psychiatric witness becomes so critical that we should recall a point first made in *State v. Durgin*, Me., 311 A.2d 266, 268 (1973), "[T]he expert should not give his opinion as to the cause of the conduct." Expert testimony may, of course, be utilized to describe the subject's mental and emotional condition at the time of the conduct complained of and to present clinical information, leaving it to the jury to resolve the ultimate question of fact. We thereby followed the precedent of *Washington v. United States*, 129 U.S.App.D.C. 29, 40–41, 390 F.2d 444, 455–56 (D.C.Cir.1967). *See also State v. Upton*, Me., 362 A.2d 738, 739 (1976).

The enactment of the Maine Criminal Code (effective May 1, 1976) has recast this issue of mental disease or defect. Adopting the American Law Institute test of criminal responsibility, the issue for the jury now is whether a mental disease or defect has resulted in a lack of substantial capacity on the part of the accused to conform his conduct to the requirements of the law or to appreciate the wrongfulness of his conduct. 17-A M.R.S.A. § 58(1) (1976). The enactment of this Code, however, has not abrogated the rule announced in *Durgin*. It remains the jury's function to determine the cause of the conduct. The psychiatric witness should not be permitted to state his opinion as to the cause, thereby usurping the role of the fact-finder. To that extent, in this critical area of psychiatric testimony on the issue of mental disease or defect, we limit the broad scope of expert testimony contemplated by Article VII of the Maine Rules of Evidence.

*Cf. United States v. Brawner*, 153 U.S.App. D.C. 1, 35, 471 F.2d 969, 1003 (D.C.Cir.1972).

which to conclude that the Defendant did not lack the capacity to control his conduct so as to conform it to the requirements of the law.

 The symptoms of the Defendant's alleged defect or disease were not far removed from that of a "normal" person with some frustrations. Those symptoms included a failure to admit feelings; being overly conscientious; being over-controlled; an inability to relax easily; a feeling of personal inadequacy; a tendency chronically to swallow difficulties without objection and lack of memory of the shooting. Evaluation of such symptoms involves a process of fixing a line. This line between normal, but criminal, behavior, and abnormal behavior, excusing one of criminal responsibility, must be drawn by the ultimate fact-finder on the basis of a complex evaluation of moral, legal and medical judgments. That decision will only rarely be reversed by an appellate court upon a strong showing that no reasonable fact-finder could conclude otherwise than that the defendant lacked criminal responsibility for his conduct. *See King v. United States, supra*, 125 U.S.App. D.C. at 324, 372 F.2d at 389; *see also Washington v. United States, supra*, 129 U.S.App. D.C. at 31, 390 F.2d at 446.

This is not such a case.

### III

The Defendant's conduct on the day of the shooting, as described above, strongly suggests that he was aware of his conduct and that he acted knowingly, even if there is a reasonable doubt that he acted with an intent to cause death.

 Inability to control one's actions does not negate the existence of a culpable mental state; rather, it serves as an excuse. [I]f the effect of the defendant's mental disease was that he was significantly lacking in the ability to control his actions, he would again have an insanity defense under at least some of the insanity tests. But it is unlikely that it could be said that this defendant, merely because of limitations upon his powers of self-control, did not act with intent (that is, with a purpose of bringing about the harmful result), knowledge (awareness that the harmful result would follow), or recklessness (awareness of a substantial risk that the harmful risk will follow), whatever the relevant mental state is for the offense charged.

W. Lafave & A. Scott, *Criminal Law* 271 (1970). A person may act knowing that it is practically certain that his conduct will cause a forbidden result, *see* 17–A M.R.S.A. § 10(2)(A), while lacking the capacity to refrain from causing the result or without appreciating its wrongfulness. *See* Comment, 28 *Me.L.Rev.* 500, 510–511 (1976).

 The presiding justice in a carefully reasoned opinion concluded that there remained a reasonable doubt as to the Defendant's intent to cause this death, but that he had no doubt as to his capacity to know that death was practically certain to result from his action. Upon the record before us these conclusions are neither inconsistent nor untenable. The absence of volition does not negate the presence of the cognition requisite for conviction. The evidence of a culpable state of mind was sufficient.

The entry is:

Appeal denied.

Judgment affirmed.

McKUSICK, C. J., and DELAHANTY, J., did not sit.