**STATE of Maine**

v.

**Michael TRIBOU.**

Supreme Judicial Court of Maine.

Argued Jan. 23, 1985.

Decided Feb. 27, 1985.

Charles K. Leadbetter, Eric E. Wright (orally), Asst. Attys. Gen., Augusta, for plaintiff.

Law Offices of Palmer & Ames, Lucy E. Bettis, James G. Palmer (orally), Brunswick, for defendant.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

WATHEN, Justice.

Michael Tribou, the defendant, appeals from judgments of the Superior Court (Kennebec County), entered on the jury's verdicts, convicting him of murder in violation of 17–A M.R.S.A. § 201(1)(A) (1983) and of aggravated assault in violation of 17–A M.R.S.A. § 208(1)(B) (1983). On appeal defendant raises two main points of error: 1) that the court erred in failing to suppress statements made by him after his arrest, and 2) that his mental condition at the time of the shooting precluded a rational factfinder from finding him guilty of murder. We find no error and deny the appeal.

I.

In the late night of September 28, 1983, defendant shot Richard Cote and Mary Tribou with a .41 revolver. Mary Tribou sur-

vived the shooting, but Mr. Cote died of his wounds. At the time of the shooting, Mr. Cote and Mary Tribou were dancing together at the Courthouse Lounge in Waterville.

Defendant had been married to Mary Tribou for approximately two years and was divorced on September 8, 1983. The record contains evidence that defendant continued to have contact with Mary Tribou after the divorce, and that defendant was jealous of other men, including Mr. Cote, who socialized with Ms. Tribou. On the night of the shooting while driving Ms. Tribou to the Courthouse Lounge, defendant told her that he wanted her to stop seeing Mr. Cote. Defendant also advised his ex-wife that she could "fast dance" but was not to engage in "slow dancing" with anyone.

The Tribous arrived at the Courthouse Lounge shortly after 10:00 p.m. Ms. Tribou left defendant to talk to Mr. Cote. Defendant asked his ex-wife to leave with him. When she refused to go he said he was "going home to kill myself." Before leaving, however, defendant broke the windshield of Mr. Cote's truck.

Defendant drove home, but he testified that he does not remember the actual trip. Before reaching the trailer, where he lived, defendant stopped at a convenience store. Next, he talked briefly with his mother at his trailer and rested for a few minutes on his bed. Defendant then returned to the Courthouse Lounge.

When defendant arrived at the Courthouse Lounge, he talked to Mr. Cote about paying for the broken windshield. Defendant also made several unsuccessful attempts to speak to Ms. Tribou after which she and Mr. Cote began to dance to a song she requested, called "Between the Sheets." Defendant testified that "Mary was looking at me with her head on his shoulder smiling, something, and then I just remember I—her squeezing him and putting her head down and I—I am not sure what it was. I just remember a weird feeling ... a weird feeling, that sunken, tight feeling." Defendant stated that he

remembered neither the shooting nor most of his attempted escape.

Witnesses to the shooting testified that defendant walked close to the dance floor, reached under his jacket and pulled out a gun, and shot Mr. Cote in the back from about six feet away and then shot Ms. Tribou in the leg while she was lying on the floor. After the shooting defendant moved quickly to a rear exit, got in his car, and drove away.

The police pursued defendant to a logging road near his mother's house. Defendant's mother helped the police persuade defendant to surrender. Defendant was placed in a police car and was read his *Miranda* rights. He was not questioned and did not ask for a lawyer; he did, however, direct the police on the best route to the main road.

The police took defendant to the Waterville Police Station where he was placed in a cell. His clothes, except for his undershorts, were confiscated, but he was given a large blanket. A District Attorney was called to the station and questioned defendant after defendant again was read his *Miranda* rights. Defendant indicated that he understood his rights but was willing to talk and did not want a lawyer. Defendant was questioned from about 1:10 a.m. to 1:50 a.m. on September 29. The resulting statement describes defendant's thoughts and actions on September 28.

An intoxilizer test revealed that defendant's blood alcohol level was .009. In addition to the results of the intoxilizer test, other testimony was given as to defendant's physical condition while in police custody. No police officer believed that defendant was under the influence of alcohol or drugs, but some officers detected the odor of alcohol on defendant's breath and one officer thought he smelled marijuana on defendant's person. In the early evening of September 28, defendant drank an undisclosed amount of rum and smoked approximately 3–4 marijuana cigarettes. At the police station, defendant complained

of an upset stomach and was given an antacid tablet. Defendant testified at trial that he vomited twice while in police custody.

Defendant was charged with the murder of Mr. Cote, the attempted murder of Ms. Tribou, and aggravated assault on Ms. Tribou. Defendant pleaded not guilty and not guilty by reason of insanity. After a jury trial, defendant was acquitted of attempted murder, but convicted of the other charges. Before the trial, defendant filed a timely motion to suppress all "evidence oral or tangible obtained directly or through the Defendant by any agent of the State of Maine." A suppression hearing was held in March 1984 at which the State presented seven witnesses and defendant presented none. Defendant asserted several grounds for suppression. On the only ground pertinent to this appeal, the presiding Justice ruled that the State proved that defendant had been advised of his *Miranda* rights and that he had "knowingly, understandingly and voluntarily waived his right to remain silent." Consequently, defendant's statements made before defendant requested a lawyer were found admissible.

## II.

Defendant contends that on the night of September 28, 1983 and the early morning of September 29, 1983 he suffered from a mental disorder which adversely affected his mental faculties and made him "legally incapable of waiving his right to remain silent." Therefore, defendant argues that statements he made while in police custody are inadmissible. The State has the burden of proving by a preponderance of the evidence that a defendant's waiver of *Miranda* rights was knowing, understanding, and voluntary. *See State v. Knights*, 482 A.2d 436, 440 (Me.1984).

■ A motion Justice's determination that a defendant waived his *Miranda* rights will be upheld if the record provides rational support for the Justice's conclusion. *See State v. Condon*, 468 A.2d 1348,

1350 (Me.1983). In this case the motion Justice found that:

The State has proven beyond a reasonable doubt that the defendant was fully and adequately advised of his "Miranda" rights and that he knowingly, understandingly and voluntarily waived his right to remain silent. No promises, threats or inducements of any kind were made to entice the defendant to waive his rights.

■ Only evidence presented to the motion Justice is considered in deciding whether the record supports the motion Justice's determination. *See State v. Stone*, 397 A.2d 989, 998 (Me.1979). The suppression hearing record fully supports the determination of the presiding Justice that defendant's waiver of his *Miranda* rights was made knowingly, understandingly, and voluntarily.

■ Defendant does not dispute that he was twice given *Miranda* warnings, and that he twice indicated that he understood each of his rights and was willing to answer questions without the assistance of counsel. Rather, defendant asserts that he was suffering from a severe mental disorder which precluded a voluntary waiver of rights. At trial, defendant presented an expert witness who testified that defendant's abnormal state of mind substantially impaired his ability to control himself. The defendant's expert did not testify at the suppression hearing and thus his trial testimony is not considered in reviewing the suppression determination.

■ The record of the suppression hearing contains some evidence that, although possibly permitting a factfinder to rationally find that defendant did not make a valid waiver, certainly does not compel such a conclusion. For example, defendant had been drinking and smoking marijuana on the day of the shooting. The testimony, however, was that defendant was not intoxicated and was not rendered unable to understand and voluntarily waive his rights. *See State v. Finson*, 447 A.2d 788, 792 (Me.1982) (even a person heavily intoxicat-

ed is not necessarily incapable of waiving constitutional rights). The evidence is that defendant was not completely physically healthy—he had an upset stomach. No evidence was presented that his illness prevented him from knowingly, understandingly, and voluntarily waiving his rights. Although defendant became emotionally upset after the questioning ended, he was calm, coherent, composed, and responsive while the District Attorney questioned him. Also, despite the fact that defendant wore only his undershorts for part of the interrogation, he was provided with a large, heavy blanket which he used to cover himself. The evidence was that the police and the District Attorney did not treat defendant in a coercive or intimidating manner. Finally, defendant was not told that Mr. Cote had died until after the questioning had stopped although the District Attorney knew of Mr. Cote's death about mid-way through the interrogation. Ignorance of the exact nature of the crime charged, however, is but one factor to consider in determining whether a waiver of *Miranda* rights is effective. *See State v. Condon,* 468 A.2d at 1350. After considering the particular circumstances of this case, we conclude that the record rationally supports the conclusion that defendant's waiver of his *Miranda* rights was knowing, understanding, and voluntary.

### III.

■ Defendant contends that he suffered from an abnormal condition of mind within the meaning of 17–A M.R.S.A. § 38 (1983) which negated intentional or knowing conduct. Section 38 provides that:

> Evidence of an abnormal condition of the mind may raise a reasonable doubt as to the existence of a required culpable state of mind.

Since culpable mental state is an element of the crimes with which defendant was charged, the State had the burden to prove the existence of the requisite mental state beyond a reasonable doubt. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

Defendant asserts on appeal that the evidence cannot support a finding beyond a reasonable doubt that he intentionally or knowingly caused the death of Mr. Cote. As support for this assertion, defendant relies primarily on the expert testimony of Dr. Charles Robinson. The defense characterizes Dr. Robinson's testimony as showing that defendant was suffering from temporary psychosis and an inability to control his actions at the time of the shooting.

■ Dr. Robinson's testimony was partially contradicted by the testimony of the State's own expert psychological witness. Further, evidence of defendant's actions and possible motivations tends to discredit the notion that defendant did not act intentionally or knowingly in shooting Mr. Cote because of an abnormal condition of the mind. Finally, the testimony of the defense's expert was marred by internal ambiguities. Even if expert testimony is unambiguous and not directly contradicted, the jury is not bound by the conclusions of experts. *See Condon,* 468 A.2d at 1351. In sum, the evidence presented warranted a finding that defendant had the necessary culpable state of mind.

### IV.

■ Defendant presented evidence that he suffered from a mental defect within the meaning of 17–A M.R.S.A. § 39 (1983) which substantially impaired his ability to control his actions. Section 39 provides for an affirmative defense of insanity. A defendant is not criminally responsible if he proves by a preponderance of the evidence that "at the time of criminal conduct, as a result of mental disease or defect, he either lacked substantial capacity to conform his conduct to the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct." *See* 17–A M.R.S.A. § 39.

Dr. Robinson's expert testimony appears to have been intended primarily to support a section 39 defense. Dr. Robinson testified that defendant's abnormal state of

mind substantially impaired defendant's ability to control his actions. The State presented no expert testimony contradicting Dr. Robinson's conclusion that defendant was unable to control himself.

As we said in *State v. Condon,* however, the "jury is entitled to draw its own ultimate conclusions where the facts and assumptions underlying expert opinions are amply exposed at trial." *See Condon,* 468 A.2d at 1351 (citing *State v. Ellingwood,* 409 A.2d 641, 644 (Me.1979)). In the present case, the testimony of police officers and other lay witnesses supports the jury's decision that defendant failed to prove by a preponderance of the evidence that he was suffering from a mental disease or defect that resulted in his substantial incapacity to conform his conduct to the law.

The entry is:

Judgments of conviction affirmed.

All concurring.