STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, SS.                                     CRIMINAL ACTION
                                                  Docket No.   CR-13-335
                                                  DHM - KEN- 1/23/2014

STATE OF MAINE

v.                                                **VERDICT**

ROBERT A. ROBINSON,

        Defendant


By indictment dated May 29, 2013, the Defendant is charged with three Class C counts, Domestic Violence Assault (Count I), Domestic Violence Criminal Threatening (Count II), and Domestic Violence Terrorizing (Count III). Defendant waived his right to a jury trial and the matter was heard before the court.

The Defendant and the victim, Jessica Luiz, have been domestic partners, on and off, for approximately five years, living at a residence on the Hallowell Road in Chelsea. Defendant's parents live nearby. Defendant has a history of very assaultive behavior and anti-social personality disorder going back to his very early years. He had suffered serious head injuries in two motorcycle accidents, the latest in 2012, resulting in some cognitive challenges. He has been under the care of a psychiatrist with a diagnosis of major neurocognitive disorder due to traumatic brain injury; nonrapid eye movement sleep disorder; history of polysubstance abuse, including alcohol; and preinjury personality disorder/traits with anti-social behavior among other things. Defendant has had great difficulty controlling his emotions without proper medication and has become subject to very violent outbursts. In addition, he is very controlling in his relationship with Ms. Luiz; she is very agreeable and vulnerable to such control. There is some indication that both the Defendant and Ms. Luiz have been unfaithful to this relationship. Defendant's jealousy, as well as perceived outside affairs on the part of Ms. Luiz, have aggravated his difficulty in controlling his emotions. Over the years of

their relationship, Ms. Luiz testified that there have been occasions of the Defendant assaulting her. In fact, Ms. Luiz testified that on the morning of April 12 the Defendant slapped her.

On April 10, one of these outbursts occurred with the Defendant placing a pillowcase over the head of Ms. Luiz and advising her that he had a knife, or a razor, which he would use to "slit her throat" in order to "teach her a lesson." During this episode, he further advised Ms. Luiz that he would use the knife to cut off her clitoris and that he had some airplane glue that he would use to reattach her clitoris so that she would not, "do a lot of bleeding for the emergency room." In this episode, the Defendant also told Ms. Luiz that he had "dug a hole in the woods and that she would fit in that hole perfectly." He threatened to cut her wrists so it would look like a suicide and he would put her in the hole to "make you disappear and no one would know."

Ms. Luiz testified that all of this activity caused her to become hysterical. She admits that at no time did he place the knife to her throat, that he only used words. She stated, "He sometimes is a lot of talk," and testified further, "I knew eventually he would snap." There is no evidence that Ms. Luiz notified any authorities of this incident.

Over the course of the next couple of days, the Defendant became more and more agitated. On April 12th he and Ms. Luiz visited his psychiatrist at Riverview where he advised the psychiatrist that he was "afraid he would do something he would later regret." He asked to be given Seroquel and Klonopin to decrease his agitation. He stated was afraid he would do something bad and "lose his girlfriend." The psychiatrist called in the prescription which was filled, and that afternoon Ms. Luis gave the medication to Mr. Robinson.[1] Defendant went to bed and fell asleep about 2:30

---

[1] There is also some suggestion that Defendant's case manager was told that Defendant also took an Ambien. Ms. Luiz did not indicate knowledge of that event but allowed there was Ambien in the house.

2

in the afternoon and at 7:00 p.m., Ms. Luiz found him in the bed and that he was "out like a light." Shortly after midnight, Defendant jumped up out of the bed and said to Ms. Luiz, "You made me late," "Its all your fault," "I can't believe you." Saying those things, he proceeded to start whipping Ms. Luiz with a belt and striking her. When she played dead to escape his wrath, he stated, "There is nothing wrong with you." She described the Defendant as having blazing eyes and growling. At some point he pushed her violently to the floor where she suffered great pain.

At some point the Defendant stopped his activities and went to sit at the kitchen table. Ms. Luiz, in her pajamas, ran out the door to lock herself in the car. The Defendant chased her, falling to the ground in the process. When he reached the car, he calmly asked her whether she had the keys and when she denied having the key, he calmly said, "Then come back into the house". Ms. Luiz went into the house and sat at the table while the Defendant went into a side room. Approximately ten minutes later, the Defendant came out of the room, again with the belt, and proceeded to start whipping Ms. Luiz again. He had also acquired a broken broom handle and started hitting her on her head. As she attempted to protect her head with her hands, she received significant injury to her hands. As suddenly as it had begun, the Defendant then stopped and he said, "Let's go to bed," and acted like nothing had happened. The whole episode took approximately one and a one-half hours.

Ms. Luiz had received injuries requiring medical attention, but, consistent with her history with the Defendant, she took a shower and waited for a visit from Defendant's mother, a customary event in the mornings. About two hours later, Defendant's mother arrived and observed Ms. Luiz's condition. She said that Ms. Luiz was upset, she was crying, and had marks on her face. She testified that she told Ms. Luiz to "go away for a while." Rather than notify authorities, Ms. Luiz got in her car

3

and drove to her mother's house in Monmouth. Her mother, seeing her condition, notified emergency medical personnel and law enforcement. While the call was handled as a medical emergency and not a criminal event as none was alleged, a Monmouth officer appeared in response to the medical call. The officer interviewed Ms. Luiz and took pictures of her condition. Ultimately, Ms. Luiz was taken to MaineGeneral Medical Center where she was interviewed by a Deputy Sheriff and further photographs were taken. Ms. Luiz did not want to make a criminal complaint or to take any action with regard to the incident.[2]

When Ms. Luiz arrived at the home of her mother, Ms. Lapierre, she was upset, shaking, had difficulty putting sentences together and had marks on her body. Ms. Luiz would only say that, "he had hurt her." Ms. Luiz advised her mother of the belt, the broomstick, the pillow case, and the threatening with airplane glue. Ms. Lapierre was concerned that Ms. Luiz appeared to be hyperventilating

Ms. Lapierre testified that she observed Ms. Luiz to have bite marks, black and blue marks, and swollen hands, and that over Ms. Luiz's objections, Ms. Lapierre had Ms. Luiz prepare a statement for law enforcement and a complaint for protection from abuse.

The Defendant does not deny the events of April 10 but insists that Ms. Luiz was not in fear. As to the circumstances of April 12 and 13, the Defendant denies having any memory of any of the activities. Based upon all of the evidence, the facts as recited appear undisputed.

Ms. Luiz testified that on three previous occasions, the Defendant had gotten up from sleeping in the bed and engaged in very unusual behavior. She said he would pace the floor and act like he didn't see her. Sometimes these events would last as much

---

[2] It is to be noted that approximately two weeks later, Ms. Luiz moved back into the house on Hallowell Road in Chelsea. She testified that still wished to live with Mr. Robinson and to marry him.

4

as an hour to an hour and a half. On one occasion, during these episodes, he ate an entire box of popsicles.

Testimony was taken from a psychiatrist and a neuropsychologist who had made examinations at the behest of the Maine State Forensic Service. The Defendant was examined by both professionals and some testing was done. The Defendant did not provide a history of sleep walking to either the psychiatrist or the neuropsychologist. However, the psychiatrist testified that the Defendant could have been suffering from an "altered state of consciousness" while sleepwalking during the activities of the early morning hours of April 13. He described sleepwalking as "purposeful behavior while asleep leaving no memory on the individual." He testified that the activities of April 10 were an indication that the Defendant was "losing it," he further indicated that a tendency to assault would affect him in this altered state of consciousness. However, the psychiatrist testified that it was not within his expertise to diagnose sleep walking, to explain the phenomenon, or to even reach a conclusion as to whether the defendant was engaged in sleep walking in the early morning hours in question. He stated that such conclusions can only be reached after the conduct of a "sleep study" by a qualified pulmonologist. He did believe that an episode of sleep walking over a one or one and one-half hour period would be unusual.

On the other hand, the neuropsychologist did not agree that there was evidence of Defendant's "altered state of consciousness." He was unsuccessful in receiving appropriate results from the testing of the Defendant conducted because he concluded that the Defendant was malingering and intentionally avoiding appropriate results in his testing. He indicated that the Defendant did not mention any episodes of sleepwalking, but instead said that he "always had a problem with anger" and that he

5

would "fly off the handle for no reason." The neuropsychiatrist indicated that sleep walking was not in his area of expertise and declined to give opinions therefore.

It is Defendant's position that his activities of April 10 did not cause fear of harm in the mind of Ms. Luiz and therefore he cannot be found guilty of domestic violence or criminal threatening. Furthermore, Defendant argues that his activities of April 13 caused him to enter an altered state of consciousness as a result of medication ingested and, that the altered state created an abnormal condition of mind giving rise as to reasonable doubt as to his culpable state of mind as charged in the domestic violence assault.

The forensic psychiatrist from the Maine State Forensic Service filed a written report as a part of his evaluation of criminal responsibility. Notwithstanding his testimony at trial, in his report, the psychiatrist reports that, based on the statements the Defendant made to Ms. Luiz, "It is probable that the combination of effects of brain trauma and medications caused him to behave as if he were awake or in an altered state of consciousness when he allegedly assaulted Jessica on the night of 4/12/13 – 4/13/13. People with brain injuries are more susceptible to medication side effects and may have unusual paradoxical responses to medications." However, in the same report, the doctor offered these conclusions:

> At the time of the allegations, Robert Robinson was not suffering from a mental illness so severe that severely impaired his ability [to] appreciate the wrongfulness of his acts. He did not have an illness that caused him to be unable to appraise his environment and consequences of his behavior, understanding his environment and making rational decisions. He could believe he was responding rationally to his perceptions, and modulate his behavior.
>
> At the time of the allegations, Robert Robinson was not suffering from a mental illness that impaired his ability to form a culpable state of mind, to act rationally, intentionally and in a planful goal directed way.

6

> At the time of the allegations, Mr. Robinson was suffering from effects of two traumatic brain injuries and was probably also significantly affected by medications which he had taken that night before going to sleep.

The medical records indicate that on January 22, 2013, a note is made by MaineGeneral Neurology that the Defendant had been sleep walking.

A person is guilty of domestic violence assault if the person intentionally or knowingly, or recklessly causes bodily injury or offensive physical contact to another person and the victim is a family or household member as defined in title 19-A M.R.S.A. § 4002(4) and 17-A M.R.S.A. § 207-A. According to the facts as found, the court is satisfied that the Defendant caused bodily injury and offensive physical contact to Ms. Luiz and that she was a family or household member as defined in law. The defense asserts the presence of an abnormal condition of mind raises a reasonable doubt as to whether the Defendant in this case acted intentional, knowingly, or recklessly. *State v. Gallant*, 2004 ME 67, 847 A.2d 413 (abnormal condition of the mind defense only permits the fact finder to entertain a reasonable doubt; it cannot compel the fact finder to find such a reasonable doubt. 17-A M.R.S.A. § 38.).

The forensic scientist has testified that the Defendant was operating under an altered state of consciousness while being engaged in sleep walking at the time of the assault. However, the doctor admits that he is not an expert in the area of sleep walking, he has never conducted a sleep study on defendant or any other patient to determine the nature or existence of sleep walking and he has never treated a person who has been subject to sleep walking. Most telling, however, the psychiatrist's report, as above quoted, makes it clear that the Defendant was capable of a culpable state of mind, "to act rationally, intentionally and in a planful goal directed way." The Defendant is a person of propensity for assaultive behavior, he admits to losing control, and seeks medication accordingly.

7

The statements at the time of assault would suggest some delusionary perceptions. However, from the previous history of the relationship between the Defendant and his victim, a significant part of his anxiety and stress was a sense of jealousy of his perception of the activities of Ms. Luiz. This does not suggest that his mindful condition was interfering with his ability to engage in intentional conduct. *State v. Sommer*, 409 A.2d 666 (Me. 1979) (although particular statements made by the defendant had a ring of irrationality in some respect, the critical point is that the threat uttered by the defendant made plain his awareness as reality, that he was using a knife against an object he knew was the breast of a woman). As in *Sommer*, there is no indication that the Defendant was not aware that he was engaging in a violent assault against his domestic partner, the attack was consistent with prior relationships.

The court, as a factfinder, may consider previous threats by the Defendant to the victim as a factor in determining whether or not there was reasonable doubt that the Defendant acted intentionally or knowingly when he assaulted his domestic partner. *State v. Bridges*, 413 A.2d 937 (Me. 1980). As stated in *State v. Page*, 415 A.2d 574 (Me. 1980), "the validity of the findings is not impaired because there was expert testimony that defendant's condition of mind was abnormal." As clarified in *State v. Ellingwood*, 409 A.2d 641, 646 (Me. 1979), "Inability to control one's actions does not negate the existence of a culpable mental state; rather, it serves as an excuse." As in *Page*, whether defendant had acted "intentionally or knowingly" with respect assault, the testimony and the exhibits was of such nature that, at most, it could only permit this court to entertain a reasonable doubt; it could not compel it, as a rational factfinder, to have such a reasonable doubt. *Page* goes onto to stress

> "[t]he fact-finder is not bound by the conclusions of psychiatrists who testify concerning their opinions of the mental condition of a defendant. Where the facts and assumptions underlying expert opinions are amply

8

exposed during their testimony in the course of trial, the factfinder is entitled to draw his own ultimate conclusions."

*Page*, 415 A.2d at 577 (quoting *Ellington*, 409 A.2d at 644).

Notwithstanding the possible existence of some undefined phenomenon known as "sleepwalking", the court is satisfied that the Defendant acted intentionally, knowingly, and recklessly in causing Ms. Luiz bodily injury.

Domestic violence threatening is, in effect, threatening if that person intentionally or knowingly places another person in fear of imminent bodily injury and that person is a family or household member as defined in 19-A M.R.S.A. § 4002(4) and 17-A M.R.S.A. § 209-A, and while there is ample evidence that Ms. Luiz was accustomed to Defendant's violent behavior toward her and notwithstanding that experience was willing to remain in the relationship, as she is today, she testified under oath as to the behavior of the Defendant on April 10, "I was hysterical." She further stated that the Defendant "sometimes is a lot of talk." She also stated that she knew that "eventually he would snap." Notwithstanding Ms. Luiz's experience and acceptance of Defendant's violent behavior towards her, the court is satisfied that on April 10, when he put a pillow case over her head and threatened to maim her genitals, she became hysterical out of fear.

A person is guilty of domestic violence terrorizing if the person communicates to any person a threat to commit or to cause to be committed a crime of violence dangerous to human life, against the person to whom the communication is made and the natural and probable consequence of such a threat, whether or not such consequence in fact occurs is to place the person for whom the threat is communicated or the person threatened in reasonable fear that the crime will be committed, and victim is a family or household member as defined in 19-A M.R.S.A. § 4002(4), 17-A M.R.S.A. § 210-B. The court so finds.

From the undisputed facts, it appears that the Defendant engaged in a domestic violence assault, domestic violence criminal threatening, and domestic violence terrorizing against Ms. Jessica Luiz.

The entry will be:

> Defendant is found guilty of Count I, Domestic Violence Assault (Class C).
>
> Defendant is found guilty of Count II, Domestic Violence Criminal Threatening (Class C).
>
> Defendant is found guilty of Count III, Domestic Violence Terrorizing (Class C).

DATED: _January 23, 2014_

_____
Donald H. Marden
Superior Court Justice

10

STATE OF MAINE
KENNEBEC, SS.

STATE OF MAINE

v.

ROBERT A. ROBINSON JR.,

Defendant

SUPERIOR COURT
CRIMINAL ACTION
Docket No.  CR-13-385
DHM—KEN-11/18/2013

**ORDER**

This matter is before the court on Defendant's motion to suppress statements made by the Defendant in response to questions by law enforcement officers. Defendant asserts that the presence of the officers in his home without an arrest warrant, without a search warrant and without consent, in the absence of exigent circumstances, caused his statements to be obtained as a result of the illegal warrantless entry and should therefore be suppressed.

On April 13, 2013, on or about 11:30 in the morning, a patrol deputy of the Kennebec Sheriff's Office was made aware of a victim at Maine General Hospital describing allegations of a particularly brutal and prolonged domestic assault by the Defendant in this case. With that information and other details, the Officer went to a location on the Hallowell Road in Chelsea at a double-wide mobile home residence. His stated purpose was to interview the Defendant who had been named by the victim as the perpetrator of the assault. The Officer knocked on the door without obtaining a response. He looked into a window to determine whether the Defendant or any other person was located therein. After a few minutes, the Defendant's mother appeared, introduced herself, and in response to the Officer's questions as to whether he was at the Defendant's residence, was told that he was. The mother tried to open the door and to receive a response without success. She expressed to the Officer a concern that she

was worried the Defendant might hurt himself as he had made threats to do so in the past. At this point, the Defendant's father appeared, and the Officer asked if he had a key to the residence.

The father testified that he owned the land at the location but the Defendant had owned the double-wide mobile home for approximately ten years. Hearing dogs barking and seeing the Sheriff's vehicle in the yard of his son's home caused the father to come to the scene and knock on the door in an additional attempt to get a response. In response to the question, he advised the Officer that he did not have the key. The father was not asked to enter the home by the Officer but he offered to get the Officers into the house, and, although he did not hear the conversation between his wife, Defendant's mother, and the Officers, he was aware from conversations with this wife, that the Defendant was on a new medication and the mother was concerned as to what affect this new medication might have on the Defendant. Under those circumstances, the father clearly intended to enter the residence to determine the well-being of his son. He obtained a screwdriver from his own residence and effectuated the entrance.

Armed with the knowledge that a particularly violent episode had taken place, as indicated by a hospitalized victim, and supported by the information from the mother that there was some likelihood that the alleged perpetrator might harm himself, the Officer followed the father into the home. The mother's concern provided the exigent circumstances.

The father entered bedrooms, checked on a bathroom and found the Defendant in a second bathroom. The Defendant told his father that he just wished to relieve himself in peace. At this point, the Officers asked the father to leave the premises. Approximately five minutes later the Officers came out of the residence with the

2

Defendant in handcuffs. The Officers did not have an arrest warrant or a search warrant.

"Warrantless entries into private homes for purposes of search, or arrest, are equally unreasonable, except in circumstances where an exception to the warrant requirement has been carefully drawn." *State v. Boilard*, 488 A.2d 1380 (Me. 1985) (*citing* M.R.S.A. Constitution Article I, section 5; U.S.C.A. Constitution Amendment IV. Recognized exceptions to warrant requirements exist in situations where entry and subsequent search are made pursuant to valid consent and where exigent circumstances exist. However, police intrusion upon private property to conduct search without warrant due to exigent circumstances is not justified in absence of knowledge of facts supporting proper determination of probable cause. *State v. Boilard*, 488 A.2d 1380.

"Exigent circumstances" exist to justify warrantless search where there is compelling need to conduct a search and insufficient time in which to secure a warrant. A police officer has a "legitimate role as a public servant to assist those in distress and to maintain and foster public safety." Police officers frequently engage "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to violation of any criminal statute." *State v. Dube*, 655 A.2d 338 (Me. 1995) (*citing State v. Pinkham*, 565 A.2d 318 (Me. 1989). In accordance with those principles, the father of the accused had a right to enter the dwelling in response to an emergency and it was reasonable for the police to accompany that family member to assist in that emergency. Further, the officer had probable cause to believe an assault had taken place from the presence of the victim in the hospital and her statements.

Domestic violence assaults are commonly found to be highly emotionally charged events between intimate partners and the information available to the Officer of the extent of the violence in the instant case suggested the probability of a highly

3

emotional circumstance with the accused as well. The stated purpose of the Officer was to go to the residence and ask such preliminary questions as would satisfy himself that the Defendant was the person being accused by the victim and was in a position to have committed the alleged domestic assault. Arriving at the premises with the knowledge of the violence of the assault and receiving information of the possibility of the threat to the well-being of the accused perpetrator and relying on the exigent circumstances that were provided to him by the parents of the accused, the court finds the entry and arrest was lawful.

While the testimony was that the building was not owned by the father, the land on which it was located was owned by the father and the familial relationship between the accused and the father who effected the forcible entry of the home was an emergency justifying the trespass.

The court did not receive testimony regarding the nature of the conversation between the Officer and the Defendant inside the Defendant's home, except to indicate that the Officer asked preliminary questions sufficient to satisfy himself of the identity of the Defendant. It is undisputed that the Defendant was given no *Miranda* warnings at the time of the confrontation in his residence The defendant was in custody as soon as he was identified as the person name by the alleged victim. The absence of that warning rendered the responses by the Defendant to be inadmissible and therefore to be suppressed.[1]

---

[1] Investigative officers are allowed to make preliminary inquiries of suspects for purposes of identification without giving a *Miranda* warning. To the extent additional questions were asked under the circumstances, the responses must be suppressed.

4

The entry will be:

Defendant's Motion to Suppress any statements of the defendant prior to Miranda Warning is GRANTED.

DATED: November 18, 2013

Donald H. Marden
Superior Court Justice

5

STATE OF MAINE
                                          SUPERIOR COURT
  vs                                      KENNEBEC, ss.
ROBERT   ROBINSON                         Docket No  AUGSC-CR-2013-00335
354 HALLOWELL ROAD
CHELSEA ME 04330                          **DOCKET RECORD**

DOB: 06/18/1968
Attorney: WILLIAM BAGHDOYAN              State's Attorney: MAEGHAN MALONEY
         WILLIAM BAGHDOYAN, ATTORNEY AT LAW
         72 WINTHROP STREET SUITE 2
         AUGUSTA ME 04330
         APPOINTED 04/23/2013

Filing Document: CRIMINAL COMPLAINT      Major Case Type: FELONY (CLASS A,B,C)
Filing Date: 04/16/2013

## Charge(s)

1    DOMESTIC VIOLENCE ASSAULT, PRIORS T 19-A    04/13/2013 CHELSEA
Seq 11288 17-A  207-A(1)(B)(2)         Class C


2    DOMESTIC VIOLENCE CRIMINAL THREATENING,    04/10/2013 CHELSEA
Seq 11290 17-A  209-A(1)(A)            Class D  Charged with INDICTMENT on Supplem
  BICKFORD           / KEN

3    DOMESTIC VIOLENCE TERRORIZING              04/10/2013 CHELSEA
Seq 11294 17-A  210-B(1)(A)            Class D  Charged with INDICTMENT on Supplem
  BICKFORD           / KEN


## Docket Events:

04/16/2013 FILING DOCUMENT -  CRIMINAL COMPLAINT FILED ON 04/16/2013

04/16/2013 Charge(s): 1
        HEARING -  INITIAL APPEARANCE SCHEDULED FOR 04/16/2013 at 01:00 p.m.

        NOTICE TO PARTIES/COUNSEL
04/17/2013 Charge(s): 1
        HEARING -  INITIAL APPEARANCE HELD ON 04/16/2013

04/17/2013 Charge(s): 1
        HEARING -  STATUS CONFERENCE SCHEDULED FOR 06/11/2013 at 10:00 a.m.

04/17/2013 Charge(s): 1
        PLEA -  NO ANSWER ENTERED BY DEFENDANT ON 04/16/2013

04/17/2013 BAIL BOND - $20,000.00 CASH BAIL BOND SET BY COURT ON 04/16/2013
        NANCY  MILLS , JUSTICE
        NO USE OR POSSESSION OF INTOXICANTS AND RANDOM SEARCH AND TEST FOR THE SAME NO CONTACT
        WITH JESSICA RUIZ NOT TO BE AT RESIDENCE PLACE OF EMPLOYMENT OR PLACE OF EDUCATION CURFEW
        8PM TO 6AM AND LET THE COURT KNOW WHERE YOU ARE LIVING BEFORE YOU LEAVE KCCJ MAY BE
        REVIEWED
04/22/2013 Charge(s): 1
        MOTION -  MOTION FOR APPOINTMENT OF CNSL FILED BY DEFENDANT ON 04/22/2013

04/24/2013 Charge(s): 1
          MOTION -  MOTION FOR APPOINTMENT OF CNSL GRANTED ON 04/24/2013
          NANCY MILLS , JUSTICE
          COPY TO PARTIES/COUNSEL
04/24/2013 Party(s):  ROBERT ROBINSON
          ATTORNEY -  APPOINTED ORDERED ON 04/23/2013

          Attorney:  WILLIAM BAGHDOYAN
04/24/2013 Charge(s): 1
          HEARING -  STATUS CONFERENCE NOTICE SENT ON 04/24/2013

05/02/2013 MOTION -  MOTION FOR MENTAL EXAMINATION FILED BY DEFENDANT ON 05/02/2013

05/06/2013 MOTION -  MOTION FOR MENTAL EXAMINATION GRANTED ON 05/06/2013
          M MICHAELA MURPHY , JUSTICE
          COPY SENT TO STATE FORENSIC SERVICE
05/06/2013 ORDER -  COURT ORDER FILED ON 05/06/2013
          M MICHAELA MURPHY , JUSTICE
          ORDER FOR MENTAL EXAMINATION: INSANITY: ABONORMAL CONDITION OF THE MIND, MENTAL CONDITION
          RELEVANT TO OTHER ISSUES.
06/03/2013 OTHER FILING -  OTHER DOCUMENT FILED ON 05/29/2013

          EXAM SCHEDULED FOR 6/5 OR ASAP
06/05/2013 Charge(s): 1,2,3
          SUPPLEMENTAL FILING -  INDICTMENT FILED ON 05/31/2013

06/05/2013 Charge(s): 1,2,3
          HEARING -  ARRAIGNMENT SCHEDULED FOR 06/05/2013 at 08:30 a.m.

06/05/2013 Charge(s): 1,2,3
          HEARING -  ARRAIGNMENT HELD ON 06/05/2013
          DONALD H MARDEN , JUSTICE
          Defendant Present in Court

          READING WAIVED.  DEFENDANT INFORMED OF CHARGES.  COPY OF INDICTMENT/INFORMATION GIVEN TO
          DEFENDANT.  21 DAYS TO FILE MOTIONS
06/05/2013 Charge(s): 1,2,3
          PLEA -  NOT GUILTY ENTERED BY DEFENDANT ON 06/05/2013

06/05/2013 Charge(s): 1,2,3
          TRIAL -  DOCKET CALL SCHEDULED FOR 08/05/2013 at 08:30 a.m.

06/05/2013 BAIL BOND - $20,000.00 CASH BAIL BOND SET BY COURT ON 06/05/2013
          DONALD H MARDEN , JUSTICE
          NOT TO USE OR POSSESS ANY ALCOHOL OR ILLEGAL DRUGS, SUBMIT TO SEARCH AND TESTING AT ANY
          TIME WITHOUT PROBABLE CAUSE, MAYBE REVIEWED
06/05/2013 BAIL BOND -  CASH BAIL BOND COMMITMENT ISSUED ON 06/05/2013

06/05/2013 Charge(s): 1
          HEARING -  STATUS CONFERENCE NOT HELD ON 06/05/2013

06/25/2013 PSYCHIATRIC EXAM -  STAGE ONE REPORT FILED ON 03/25/2013

OTHER MENTAL CONDITIONS.   COPY MAILED TO ATTY BAGHDOYAN AND DA OFFICE.
07/15/2013 PSYCHIATRIC EXAM -  STAGE TWO REPORT FILED ON 07/15/2013

          COPY MAILED TO ATTY BAGHDOYAN AND DA OFFICE.
08/08/2013 Charge(s): 1,2,3
          TRIAL -  DOCKET CALL HELD ON 08/05/2013
          M MICHAELA MURPHY , JUSTICE
          Defendant Present in Court
08/08/2013 Charge(s): 1,2,3
          TRIAL -  DOCKET CALL SCHEDULED FOR 09/04/2013 at 09:15 a.m.

09/05/2013 Charge(s): 1,2,3
          TRIAL -  DOCKET CALL HELD ON 09/04/2013
          DONALD H MARDEN , JUSTICE
          Defendant Present in Court
09/05/2013 Charge(s): 1,2,3
          REQUEST -  WAIVER OF JURY TRIAL FILED ON 09/04/2013

09/05/2013 Charge(s): 1,2,3
          REQUEST -  WAIVER OF JURY TRIAL APPROVED ON 09/04/2013
          DONALD H MARDEN , JUSTICE
09/06/2013 Charge(s): 1,2,3
          TRIAL -  BENCH SCHEDULED FOR 09/20/2013 at 08:30 a.m.

          NOTICE TO PARTIES/COUNSEL
09/06/2013 Charge(s): 1,2,3
          TRIAL -  BENCH NOTICE SENT ON 09/06/2013

09/11/2013 OTHER FILING -  OTHER DOCUMENT FILED ON 09/11/2013

          ADDENDUM SUBMITTED BY LYLE VOSS MD.  COPY MAILED TO ATTY BAGHDOYAN AND DA OFFICE.
09/16/2013 Charge(s): 1,2,3
          MOTION -  MOTION TO CONTINUE FILED BY STATE ON 09/16/2013

09/20/2013 MOTION -  MOTION FOR SANCTIONS FILED BY DEFENDANT ON 09/20/2013

09/27/2013 MOTION -  OTHER MOTION FILED BY DEFENDANT ON 09/27/2013

          MOTION TO ALLOW LATE FILING OF MOTION TO SUPPRESS
09/27/2013 MOTION -  MOTION TO SUPPRESS STATEMENT FILED BY DEFENDANT ON 09/27/2013

10/25/2013 HEARING -  MOTION TO SUPPRESS STATEMENT SCHEDULED FOR 11/05/2013 at 09:30 a.m.
          DONALD H MARDEN , JUSTICE
          NOTICE  TO PARTIES/COUNSEL
10/25/2013 HEARING -  MOTION TO SUPPRESS STATEMENT NOTICE SENT ON 10/25/2013

10/25/2013 Charge(s): 1,2,3
          TRIAL -  BENCH SCHEDULED FOR 11/20/2013 at 09:00 a.m.
          DONALD H MARDEN , JUSTICE
          NOTICE TO PARTIES/COUNSEL
10/25/2013 Charge(s): 1,2,3
          TRIAL -  BENCH NOTICE SENT ON 10/25/2013

10/25/2013 Charge(s): 1,2,3
 TRIAL - BENCH SCHEDULED FOR 11/22/2013 at 09:00 a.m.
 DONALD H MARDEN , JUSTICE
 NOTICE TO PARTIES/COUNSEL
10/25/2013 Charge(s): 1,2,3
 TRIAL - BENCH NOTICE SENT ON 10/25/2013


10/29/2013 HEARING - MOTION TO SUPPRESS STATEMENT CONTINUED ON 10/29/2013

10/29/2013 HEARING - MOTION TO SUPPRESS STATEMENT SCHEDULED FOR 11/04/2013 at 09:00 a.m.
 DONALD H MARDEN , JUSTICE
 NOTICE TO PARTIES/COUNSEL
10/29/2013 HEARING - MOTION TO SUPPRESS STATEMENT NOTICE SENT ON 10/29/2013


11/07/2013 OTHER FILING - WITNESS LIST FILED BY STATE ON 11/07/2013

11/13/2013 Charge(s): 1,2,3
 TRIAL - BENCH CONTINUED ON 09/20/2013


11/18/2013 HEARING - MOTION TO SUPPRESS STATEMENT HELD ON 11/04/2013
 DONALD H MARDEN , JUSTICE
 Attorney: WILLIAM BAGHDOYAN
 DA: FRAYLA SCHOENFELD
 Defendant Present in Court
11/18/2013 MOTION - MOTION TO SUPPRESS STATEMENT GRANTED ON 11/18/2013
 DONALD H MARDEN , JUSTICE
 COPY TO PARTIES/COUNSEL
11/18/2013 ORDER - COURT ORDER FILED ON 11/18/2013
 DONALD H MARDEN , JUSTICE
 DEFENDANT'S MOTION TO SUPPRESS ANY STATEMENTS OF THE DEFENDANT PRIOR TO MIRANDA WARNING IS
 GRANTED

A TRUE COPY
ATTEST: _____
 Clerk